Please be seated. The clerk will call the first case. Good morning, everyone. Welcome to the Illinois Appellate Court, First District, First Division. We're going to ask that the lawyers who are going to argue today please step up, introduce themselves, and tell us whom you represent. Plaintiff. Good morning, your honors. May it please the court, my name is Eric Bodo of the law firm of Cohen and Bodo. On behalf of the Plaintiff Appellants, Glen and Marie Brock. Thank you. Good morning, my name is Rachel Kaplan and I represent the CTA. May it please the court, Justin Hooper for the City of Chicago. And you are who? Joe Justin Hooper. Hooper, okay, thank you. All right, thank you, counsel. Before you all step back down, a couple of housekeeping matters. The court has received a motion for leave to file a SIR reply and we have received a response to that. The court understands the issue presented in that motion. The court is going to take that motion with the case and it need not be belabored in the argument today. All right. Under Illinois Supreme Court Rule 352B, each side has 20 minutes for the main argument. The appellant has 10 minutes for rebuttal. Does the city and the CTA work on an agreement as to how to split time? Yes, we've agreed to split the time, your honor. All right, thank you. We may change things as we go along if we have a lot of questions or if things become repetitive. Please remember to speak loudly. Our microphones don't amplify very well. They're here to merely record what's being said. And please understand we have read the briefs and are familiar with the facts of the case, so devote your time to the strongest arguments. I would also note Justice Cunningham is the third member of the panel. She's unable to be here today due to illness. However, she will review the tape recording and I know already that she has read the briefs and is familiar with the record and will participate in our deliberations at the appropriate time. All right. Thank you, counsel. Plaintiff, you may begin. May it please the Court. Good morning again, your honors. Eric Bodo on behalf of Plaintiff Appellants. In the matter, Mr. Glenn and Ms. Marie Brock. The first point I'd like to address to the Court this morning, your honors, is the case of Keisel with regard to the CTA. That is the crux of the matter, after all. It's our position, members of the Court, that the trial judge in this case erred in its interpretation of the actual holding of Keisel as well as applying the case to this instant case. The case in Keisel that the Court essentially held that the instruction of a heightened duty of care was improper at trial of the matter in the underlying trial court as a consequence of the specific facts of that case. The specific facts of that case were, essentially, the natural accumulation situation of snow and ice all over the platform, all over the streets near the platform, generally prevailing. It was, therefore- Wasn't Keisel a totally different procedural case from what we have here? I mean, that was after a full hearing or a full trial and a request for an NOV, and this is a summary judgment. Correct. It's a procedurally different stage as well, which I would actually suggest strengthens our argument. It's completely an opposite, essentially. Not only procedurally, but factually. Now, we choose to emphasize the factual aspect of the case, but Your Honor is correct. With regard to the facts, though, this case involves a specific hazard, not a prevailing condition, not a natural accumulation. The whole is the hazard in our case. In Keisel, it was the prevailing condition. That's number one. Number two, Keisel only stood- and this is more important, perhaps- Keisel only stood for the proposition that the instruction of the heightened duty of care was inappropriate under those facts. It did not relieve the CTA of its duty under a theory of general negligence or under willful and wanton conduct or anything else. It simply said the heightened standard of care was inapplicable. But doesn't it say that an obvious pothole is a dangerous condition? We agree. An obvious pothole would be a dangerous condition. Unfortunately, under the facts of our case, it was certainly not obvious, and the trial court held that as well. Those facts are on both sides, are they not? Well, it was disputed, absolutely, which is why the summary judgment granting was inappropriate. But, Your Honors, insofar as the Keisel case is concerned, the more important aspect of it is this. The CTA is, under any circumstance, not immune from a general negligence claim. What the trial judge in this case essentially did was to say that because Keisel applies, the CTA is simply not liable for any standard of inappropriate conduct, which, of course, is, number one, not the holding of Keisel, and number two is contrary to prevailing case law. In other words, Keisel didn't say that the CTA was not liable under any theory at all. It simply said it was not liable under the heightened standard of care due from a common carrier. Because of the factual scenario prevailing in that case, which is not present here. And with that, I would dispose of Keisel. Moving on, with regard to the Harding case which we cited, we cited that simply for the fact that the court in that case acknowledged the fact that pre-existing knowledge of a condition or a hazard on the part of the CTA should be considered. And it did. Now that factually differs from our case in the sense that there was an assault on a platform owned by the CTA, operated by the CTA. But the idea is that the trial court in this case did not consider the fact that the CTA had previous knowledge of the hazard and actually specifically placed their vehicle such that the door opened immediately over the hazard. Okay. You said Harding, not Haynes, right? I'm sorry, Haynes, correct? You did. Haynes, Your Honor. Thank you. Can you, if we can, pinpoint in the record what, the bus driver was deposed, wasn't he? He was. All right. What did he, can you summarize what he said regarding his prior knowledge of the pothole? Yes, Your Honor. Record 816, the Wade deposition is provided at page, and record 816 consists of four pages of the deposition because it's in the mini format. On page 27, Mr. Wade states he saw the pothole before the date of this occurrence but had been there at least three weeks prior to the date of the occurrence. He described the pothole as massive and described the pothole as being right at the location of the bus stop prior to the date of this incident. He then further tested, this was at page 27, 28, and 29 respectively, of his deposition all contained at record 816. He goes on to say that he had to angle the bus into the parking, into the location where the incident occurred because of the pothole. Unfortunately, he placed it in such a way that the rear door was exactly over the pothole. So, Haynes says that the CTA has a duty of, imposes a duty of active diligence, vigilance, excuse me, isn't that right? It does. So, where does this end, this active diligence, vigilance? How do we describe that? What's the realm of that? I mean, do I always have to be actively aware of what's going on in every condition of the street? Well, a reasonable driver should be aware of the conditions and what's going on around them as they operate their vehicle, certainly. We're fortunate in this case in that we have a fairly simple, and I would submit fairly obvious facts scenario that would describe what a driver should or should not do. Under the facts of this case, this driver knows of the hazard, should be aware of it. In fact, he is to the point that he kind of angles in to avoid it, but places the bus rear door right at it. But didn't he give notice? Didn't he say to the people, come on, get off? That's disputed, but yes, the driver claimed in his deposition to have said, you know, watch out if you're going out the rear door. Now, both the witness, Ms. Calhoun, and our client testified that they didn't hear that, but he did claim that he made that request. Is there any evidence in the record as to how crowded the bus was? Not particularly, Your Honor. There is actually also a dispute as to how many passengers got out the rear. We're not sure. The driver in his deposition said he saw two people get safely out the rear door before our client attempted. Ms. Calhoun and our client both said no. Our client was the first one out. Ms. Calhoun said if he hadn't fallen in, I would have. So there is a dispute as to how many people were emerging from that door, if that's the question. And there isn't specific testimony as to the number of people on the bus at the time. No, I ask the question because, you know, a large part of both parties' arguments with respect to the CTA rest on the alleged announcement by the driver that people should not exit through the back door because, obviously, the bus driver knows about this giant pothole. Correct. And especially if it's one of these large articulated buses, unless the bus driver is using a very high-quality microphone, they may not have heard it. That's what I'm wondering what the record tells us about that whole scenario. Yeah, there is a dispute in that regard, certainly. With regard to the argument of CTA that the condition was open and obvious, I think that can be disposed of fairly summarily. There is a lot of testimony, both by way of Ms. Calhoun and the plaintiff, that this thing was concealed. It looked like solid ground until you stepped on it. Ms. Calhoun said she would have stepped in it if our client hadn't. The trial court also found that it was not open and obvious, but that it is argued by the CTA in this appeal, and so I address it briefly. With regard, I think the more pertinent argument, the more difficult question here is with regard to the City of Chicago. I'm going to turn to that now. With regard to the City of Chicago, there is an issue with regard to the prevailing municipal code at the time of the occurrence, and that was the basis for the emergency motion to file the CERB reply, which Your Honors will consider, and I will not address it in much length, except to cite the municipal sections that were originally provided to the court, which were dated 2014. Essentially, there are two code provisions that we need to highlight here today. The first code provision allows buses to stop at the CERB to load or unload passengers with a requirement that the front wheel be 18 inches from the CERB. There is no corresponding requirement with regard to the rear wheel of the bus on that side. And, in fact, the municipal code allows for the bus to be at slight angles because it's supposed to be roughly parallel to the CERB, not exactly parallel to the CERB. What does your complaint say, Counselor, relative to this part of the municipal code? The complaint? Yeah. The original complaint doesn't address the municipal code per se. The original complaint is addressed as a general negligence claim and then the common carrier as well. Okay. Thank you. With regard to the municipal code, then, it allows for slight angles and variations of the bus in its wording. It also specifically says, and this is Section 050 of the municipal code, it says specifically that the bus is to be placed in that fashion so as not to impede moving vehicular traffic. That is the stated intent of that section. The intent of that section being stated is, therefore, not to prevent passengers from stepping onto the street before they get to the CERB. The stated intent is to allow for the uninterrupted flow of vehicular traffic around the passenger vehicle, around the bus. So are you saying somehow this code trumps the case law as far as what the duty is of the city? No. Okay. No, I'm not saying that. But the reason I say it is because Vance does. Vance and Wolowitzki both cite the municipal code of Chicago. They both refer to only that section, which is an interesting point. They refer only to that section of the 18-inch requirement of the front wheel on bringing the bus to a stop. And was the 18-inch requirement in force at the time of the accident? Well, we really don't know that because in all the materials provided by the city in the course of this case, there were 2014 municipal codes, which, of course, weren't in effect in 2008 at the time this accident occurred. Well, the same language could have been in effect in a prior code. It could have been, but we don't know that, which is, I think, the basis and the reason for the emergency motion regarding the CERB reply because to that proposed reply they attached then the appropriate municipal code dated appropriately to the time of our incident. There is, however, a second section of the municipal code, which has been provided by the city of Chicago. And that code section is more important, I would suggest, even. Because while it says that vehicles not specifically designated to be in that lane, i.e., if we're talking about a CTA bus lane, you shouldn't be pulling your box truck up in that lane because it's designated for use by CTA buses. It says that, but then it goes on to say, even so, vehicles can be pulled into that lane for the expeditious loading or unloading of materials or passengers on a standing basis as long as they don't impede other vehicular traffic. And that phrase, not impeding other vehicular traffic, is key because really that's the basis for all the other case law I'm going to be citing with regard to this city. Both statutory sections refer to that, not impeding movement of traffic. So what it really means for our purposes is, the municipal code does consider the possibility of other vehicles being present in the CTA bus lane other than a CTA bus. It would prefer they weren't, but it allows for it specifically. Now, the question is this. If the city acknowledges that other vehicles may well be present in that lane, which is essentially a CTA parking lane or a CTA bus lane or a CTA standing lane. It's a bus stop, right? Right, it's a bus stop lane. Other vehicles may be there for the purposes of unloading or loading materials or unloading or loading passengers, as long as it's quick. Well, that means certainly that the city comprehends that people will be getting in and out of those vehicles. How else could they possibly unload, load, or discharge or allow passengers to enter the vehicle? That's the crux of it, because now we're on to Curatola. Once the city acknowledges that that lane where the CTA buses can pull out may also be used for other purposes and vehicles standing, parking, unloading, discharging passengers, you're into Curatola at this point. Now, the Supreme Court in Curatola... Let me ask you this. Intended and permitted, does that mean may be used by other people? Is that the definition of that? You said the city would acknowledge that it may be used by other people. Right. But it's recognized by the city that it... It may have two meanings. You could say it's may in terms of permission or may in terms of it's... A possibility, right. Metaphysically possible. Correct. Or might be. Correct. It's our argument that it is comprehended by the city and acknowledged by the city that that can occur. They therefore recognize it as a possibility. Because it's recognized by the city, it becomes intended and permitted. There are all kinds of possibilities of people that could be using that portion of the roadway, is there not? Absolutely. But the case law... Now the case law comes in. This is what makes our job a little easier, because there are essentially two strands of cases. Chiritoa is the key case for our purposes because it essentially recognizes... In fact, in it's wording it recognizes that Vance and Willowinsky are an exception to the general rule that a parking lane is an area of intended and permissive use where it's allowed. Vance and Willowinsky are first district cases, no question. And they both say essentially that where a lady in one case is getting off a bus and steps in a pothole approximately a foot from the curb as she emerges from the bus, she's not an intended or permitted user. But Vance and Willowinsky both, as I mentioned before, rely only on that one section of the Municipal Code without reference to any other for the proposition that she's not an intended user, because they read that first section as saying the 18-inch requirement is there and that is there because they don't want people stepping in the street. But the plain wording of the Municipal Code section says it's there because they don't want the bus obstructing moving traffic. Now, Curitola, the Supreme Court says, yeah, Vance and Willowinsky say what they say, but they are attempting to draw a very specific exception for some reason. The Court does not overrule Vance. The Court does not overrule Willowinsky. As far as we know, they're not overruled. But they've been questioned by the wording in Curitola, which is a Supreme Court decision. And in that case, as well as DiDomenico, there's a strand of cases that we cite in our brief, and I'm not going to go through ad nauseum because it's very extensive, that all draw a distinction between parking lane and moving lane. And all of the cases that find that the City of Chicago does not owe a duty because the plaintiff is not an intended or permissive user involve situations where the plaintiff is attempting to cross the street outside of a crosswalk. That's the distinction. When you're trying to cross moving traffic, a city can't possibly be made liable for any incident that occurs because you get hit by a moving car. The burden is too great at that point. And that's what Curitola recognizes. The Supreme Court says that we're drawing a very clear line here, literally and figuratively, by designating the parking lane as one thing and the moving lanes of the roadway as another. Well, isn't it the standardism of pedestrian? What's a pedestrian doing? They consider a pedestrian someone who's crossing the street or someone who's getting out of their car after parking it. Sure. A pedestrian, in the general sense, would fit either of those descriptions. Absolutely. That's correct. However, the liability involving a pedestrian differs based on where that pedestrian is located. In this case, we have a bus in a lane that's designated for CTA drop-off, pick-up, and that is also allowed by the city of Chicago to be used by private vehicles for essentially the same purpose. Curitola says… Do we really know that from the record? It was my impression living in Chicago for 53 years that bus stops were no parking zone. And you can't technically be illegal even to drive your car into it for the purpose of letting someone out of your car. True. That's true. Where there is applicable signage, the signage says specifically in that area there is no parking allowed, that's a different fact scenario because that signage is not shown to be present in this case. Likewise, in DiDomenico, the case stands for the proposition that as an individual is floating or trunk in an area that has no signage, so you don't know if parking is allowed or not, the parking lane is still a protected area, still an area of intended and permissive use. If there's any question, in other words, if there's any question about the usage of the area, the courts favor intended and permissive use in the parking area. All right, Mr. Dodo, you have about a minute left, so sum up please. Thank you. Please support. Your Honors, essentially it's our position the trial court erred with regard to both the CTA and the City of Chicago for the reasons stated. Thank you. Thank you. Ms. Kaplan. May it please the Court, opposing counsel, my name is Rachel Kaplan and I represent the CTA. Before I get into my main argument, I would like to respond to the questions that you asked of opposing counsel relative to two issues, one of which was whether or not the bus was crowded, and secondly, whether or not there was a warning. As to whether or not the bus was crowded, there is consistent testimony both from Calhoun at page 691 in the record, who describes the bus as being packed on the day in question, as well as from the bus operator, who on page 841 indicated that all the seats were taken and there were only standing passengers on the bus. As to the warning issue, during Calhoun's deposition, she was not asked whether or not she heard a warning. However, Brock did say at 675 in the record that he did not hear a warning, although the bus operator stated that he did in fact issue a warning about something being in the back of the bus. I'd like to focus on three arguments today. The first is that the CTA does not owe the highest duty of care as it relates to street conditions. The second is that Brock was contributorily negligent here. And the third is that the pothole was open and obvious. Under Keisel, there is an exception to the CTA's highest duty of care when street conditions cause injuries to alighting passengers. That is exactly what happened here. And under Keisel, street conditions include things like unevenness and defects. And they surely include a situation like a pothole, which is what is at issue here. The rationale behind Keisel is that the CTA has no control over the potholes. Therefore, it is not responsible for repairing them and it is no highest duty relative to them. The bus operator here was generally aware of the pothole. However, he did not know its specific condition on the day of the accident. And anyone living in the city of Chicago knows that potholes are virtually everywhere on the city streets, particularly in winter, and that they come in all shapes and sizes, and most importantly, that their conditions are continually changing. They change due to road usage, they change due to pedestrian patterns, and they change, most importantly, due to weather conditions. This was a pothole that I think your driver testified he had known about it for three weeks. So I'll give you that it changes and morphs and usually gets bigger rather than smaller, especially in the winter when the asphalt plants are closed and they can't be filled. So in Chicago winters, we live with a lot of potholes. But what the plaintiff is trying to hang on the CTA here is that your driver knew about this pothole because he ran the route constantly and therefore was violated as some kind of tortious duty, tort-related duty, by parking the bus in such a way that the people going off the back door would automatically plop right into the pothole. Well, yes, Your Honor, the bus operator generally knew of the pothole, but he did not know the condition of the pothole. So, for example, if it had snowed recently, and both Calhoun and Brock testified that it had snowed within the last day or two, and the snow filled the pothole, the pothole, even though there was a pothole, could pose no danger whatsoever. So just because there's a pothole doesn't mean that it's a static condition, and it doesn't mean necessarily that it presents a danger. And for this court to charge the CTA and its bus operators to know the condition of each and every pothole through miles of city streets and hundreds of bus stops is not only unreasonable, but impracticable. Further – Counsel, let me ask you, what about the descriptions given by the various persons that testified relative to the size and the condition of the pothole? As to the open and obvious issue? Oh, you're going to get to that point. Yeah, I can certainly answer that now if you'd like me to. Either way. No, you can wait. Okay. As to a common carrier's highest duty of care, it's also important to note that this is not an absolute duty.  The primary job of a bus operator is to drive passengers safely from point A to point B while avoiding pedestrians, while avoiding traffic, and while following the rules of the road. Even Brock admitted on page 22 of his opening brief about all the challenging situations that this bus operator faced when he tried to park the bus, curb the bus, on the day of the accident. Counsel, what do you do with the Captain May case or Katami case, however we say that, that says the CTA owes the highest duty of care to those that are boarding or alighting? Well, the Katami case was a situation involving a subway platform. The CTA owns its subway platforms, and the CTA has control over them. The CTA, as the Keisel case said, does not have control over the streets, and the Keisel case does create a specific exception to the highest duty of care when the conditions of the street are at issue, which is what has occurred here. Going back to the specific situation at the bus stop here, as I mentioned, even Brock admits it was a very challenging situation, and that the bus operator had very limited options in terms of what he could do with his bus. It was early February. There was snow on the ground. There was a car parked right at the bus stop. The bus operator tried to angle in as close as possible to that, particularly because he was trying to let an elderly passenger with groceries alight on the bus. The bus, as I mentioned earlier, was very crowded, and the bus operator was doing his best to avoid the pothole. In addition, the bus stop itself was located right under the Green Line L Station, so there were passengers from the Green Line L Station going out of the station, entering onto Ashland Street, which is right where the bus stop was, and in addition, there was a circular driveway also right by the exit of the L Station where CTA buses routinely would go through and pick up passengers departing from the L Station. The second argument I'd like to make is that Brock here was contributorily negligent. He did not act reasonably here. In fact, he specifically admitted that he did not look down and that he paid no attention before he stepped out of the bus, and that's at page 662. But how does that play into the fact that we're not doing this from a trial, we're doing it from summary judgment? Yes, but it is relevant from the perspective of that he himself did not exercise reasonable care and that he is more than 50 percent contributory negligent because when he stepped down, he failed to look even though he had full opportunity to look. He was very close to the pothole. And I know we can affirm on any basis in the record, but did Judge Flanagan ever touch on that as a basis to get the CTA out of the case? The judge did not address this issue, Your Honors, not specifically. But this Court should not put the entire onus for passenger safety on the CTA, particularly whereas here Brock failed to exercise reasonable care for his own safety. As Calhoun did, Brock could have swung around the pothole. He could have used the front exit of the bus. He failed to do neither, and he failed to exercise reasonable care for his own safety. The CTA's final argument is that the pothole was open and obvious here, so it has no duty under that framework as well. But don't we have conflicting testimony on that? Don't we have people who say it was full of ice and slush so it was more or less undistinguishable from the surrounding un-pothole-packed pavement? There really is no competing testimony, Your Honor. All three witnesses, Brock, Wade, and Calhoun, all testified unanimously about its large size. They all agreed that it was large, massive, enormous, at least one or two feet wide, deep enough to hold Brock's foot or ankle, and the only person who spoke to the visibility of the pothole was Calhoun. And her comment at page 697 of the record was that it was kind of camouflaged. She did not say it was completely camouflaged. She did not say it was fully camouflaged. She said it was kind of camouflaged. All right, but let's give her that. She said it was kind of camouflaged. Why doesn't that create a material issue of genuine fact preventing summary judgment? Because that is enough information for this Court to conclude that the risk was apparent to a reasonable person. If it was kind of camouflaged, that means it was at least visible partly, and that is enough to show that this particular pothole was, in fact, open and obvious, especially in light of the unanimous comments about its size, which was enormous, as well as its depth. Counsel, are you saying in the deposition the plaintiff admitted then that it was open and obvious? No, Your Honor. The plaintiff did not observe the pothole whatsoever before stepping down, which is one of the reasons why we're saying that he's contributory negligent. The only person to comment about the pothole whatsoever in terms of what it appeared like was Calhoun, and she was the one who said that it was kind of camouflaged. For these reasons, Your Honor, the CTA respectfully requests that this Court affirm the summary judgment awarded to it by the Circuit Court. Thank you. Thank you, Ms. Kaplan. Mr. Hilbert. May it please the Court. Summary judgment for the city was proper in this case because Brock was not an intended and permitted user of the street where he fell. To begin, the law is clear that the city owes no duty to a passenger who falls in the street while exiting a bus. Section 3-102 of the Tort Immunity Act limits the city's duty to maintain its property only for intended and permitted uses. Thus, the city owes no duty to a pedestrian using the street outside of a crosswalk because the city does not intend for pedestrians to use the street elsewhere. The only narrow exception to this rule is for pedestrians using the street to access a legally parked vehicle, which Brock was not. Indeed, in Waldensky and Vance, this case is virtually identical to Brock's. This Court twice held that the city owed no duty to a person who fell in a pothole while exiting a CTA bus. Counsel, you want to address your opponent's argument that Vance and Waldensky only based on that municipal code and should not have any application. I see that the Court uses dubious in its brief as to the holding of those cases. Well, Your Honor, I don't believe it's correct that Vance and Waldensky based their holding entirely on that provision of the code. They certainly did properly rely on that provision of the code to see that the city had indicated in the municipal code that buses should come in within 18 inches of the curb and, therefore, pedestrians are expected to step to the curb and not into the street. And certainly there's no other indication anywhere in the code or elsewhere inviting pedestrians into the street, unlike with a parked car, where the city actually allows and invites people to park in the actual street itself. The bus stop is actually on the curb. All indications, the signs, the stand, where passengers wait, the areas, the shelters, all those things are on the curb, not in the street. And in Vance, this Court specifically rejected the analogy between a parked vehicle and a bus for that reason, saying that with parked vehicles, the city has actually invited and allowed expressly the use of the street for that purpose. And that's where I think you get yourself in a trap, all right? Because doesn't the city also invite these giant CTA buses to go up and down, you know, 100 different routes on the street, and these buses are, you know, whatever, 70 feet long, and they've got two exits, right? And the bus has a back exit. So the back exit does not exit onto the crosswalk, does it? No, Your Honor. Certainly does not exit into a crosswalk. But the back exit is required to be parallel with the front of the bus, and the front of the bus is specifically stated for waiting. It may be required, but what are they supposed to do if there's something blocking where the back door would open? Well, certainly, Your Honor, there may be cases where a bus can't approach the curb in that manner, but while it may make it foreseeable that people may exit in some conditions on the street, foreseeability is not to test under the Tort Immunity Act. The test is what the city intends. And just because a use of the street may be foreseeable does not make it an intended use. One has to look at what the city has actually said about the particular use and whether the city has made any manifestations of an indication that it intends for that use. Just because a use is foreseeable, the law is clear that that foreseeability alone does not make it an intended use under the statute. It may be a permissible use in that case, but it's certainly not intended. So what I think we're logically concluding here from the city's argument is we live in the real world of the city of Chicago, and we have these areas blocked all the time because it would be an imaginary world where these giant buses could always, always park directly parallel to the curb. That's not the real world. We've got construction. We've got other buses. We've got taxi cabs. We've got everything else going on. So what are you saying is that in case it's blocked, the bus can't park next to the curb, and there's a giant cartoon-like open pothole. Not a pothole, but an open manhole. And a person walks out, doesn't see the manhole, and drops down. The city's not liable for that, for not guarding the manhole with some kind of barrier. Respectfully, Your Honor, the city is not liable unless the city is intended for the person to walk in that area. And that's true for all of them. There are many foreseeable uses of the streets in the real world. And the Illinois Supreme Court was clear in Vaughn that just because there are foreseeable uses in the real world context of the street, that those foreseeable uses may be permissive, but they are not intended uses. And for that reason, the General Assembly has chosen as a policy matter to limit the city's liability in those cases. For example – But the General Assembly, the language of the statute only goes as far as saying intended and permitted, right? That's correct. It doesn't define that for us very well. But the case law has made clear that both of those elements are required, and that in the case of uses that are not intended but are reasonably foreseeable and permissive, that that is not enough to trigger liability or a duty under the statute. The statute is clear that both elements must be met. It must be intended by the city and permissive. And without the intention, there is no duty under the statute. How do we know what the intentions of the city are or is? How do we know this? Well, one, we can look to the ordinance which requires a bus when unloading or loading passengers to come within 18 inches of the curb with its front wheels and to be parallel on the backside. And two, we can look – what the courts have said is to look at the physical manifestations in the area as to whether or not an area of the street is intended to be used by pedestrians. For example, that's why crosswalks have been deemed to be an area where the city has a duty, and that's why areas where the city actually allows parking spaces along the curb have been deemed to be an area where the city has a duty because the city has manifested an intent within those areas of the street itself for more than just traffic to be there but also pedestrians. Here, all the manifestations of what the city intends, both in the ordinance and as far as the physical manifestations of the bus stops itself, are all about the curb, and they're not in the street. Could we say that the city has shown intent that 18 inches between – that the municipal ordinance talks about is intended use for a person? Respectfully, no, Your Honor, because there's nothing to indicate that the city allows at 18 inches to allow people to walk within that space. The city gives a maximum amount to a bus driver to pull the bus within 18 inches, but by all indications from everything else, the bus stop is on the curb itself, and the city intends for people to step there. There's nothing in the street itself where the city has said to people you can wait for a bus here or you can get on and off the bus here. Unlike with parked cars where there's an actual parking space in that area or a crosswalk where there's an actual crosswalk on the street, it's different here because there's no such physical manifestation in that area of the street. The manifestation is on the curb itself. Briefly, I would like to address an argument that the plaintiff's counsel raised, which was that the city's ordinance allows for temporary standing to discharge passengers. One, that that ordinance actually says it is illegal to park or to stand your vehicle in a bus lane with the exception of briefly to let someone out and only if it doesn't interfere with the bus itself. Otherwise, standing and stopping isn't illegal under that ordinance. And two, this is an argument that has never been raised by plaintiff at any point, and so therefore should be waived as far as raising it for the first time in oral argument. We cited that section of the ordinance to specifically respond to the argument that this was a parking lane where this occurred, and therefore Mr. Brock should have been deemed to have been in the parking lane when in fact this was not a parking lane at all. The ordinance makes clear that parking is actually illegal in this part of the street. So if there are no other questions, Your Honor, the city would respectfully ask that this court affirm summary judgment in its favor. Thank you, counsel. Mr. Bodo. Rebuttal? Brief rebuttal. Well, the city will protect you unless you happen to use public transportation. There is no reason, other than a legal fiction, to differentiate between a passenger of a private vehicle and a passenger of a CTA bus. They're all passengers. They're all in a vehicle, and they're all getting in or out. The municipal court I referred to earlier was provided in the appellee's response brief. It's code section 964.140, and it says essentially what I said before, that it's not proper to park a private vehicle in the CTA bus lane. However, that provision shall not apply to a vehicle engaged in the expedition's loading or unloading of passengers when such standing does not interfere with any bus or other, I'm paraphrasing here, other truck. That means the city allows it and knows they allow it, and that means it's intended and permissive use. Why we should differentiate that from a passenger on a bus, I have no idea. Thank you. All right. Thank you, counsel, for the arguments. Since there are students in the room, I'd also note for the sake of the record, we have received the amicus brief in this case filed by the Tri-Lawyers Association, and the court has reviewed that brief as well and will consider the arguments contained therein. The case will remain under advisement and court stands in recess. Thank you.